**F I L E D**

OCT 1 8 2016

10-18-16

Judge Edmond E. Chang
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | |
| --- | --- |
| | No. 15 CR 620 |
| v. | |
| | Judge Edmond E. Chang |
| SYNESI ASSOCIATES, LLC | |

## PLEA AGREEMENT

1.     This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant SYNESI ASSOCIATES, LLC, and defendant's attorney, SHELLY B. KULWIN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(A), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2.     The indictment in this case charges defendant with honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346 (Counts 1-4, 6); and honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346 (Counts 5, 7-20).

3.     Defendant has read the charges against it contained in the indictment, and those charges have been fully explained to it by its attorney.

4.     Defendant fully understands the nature and elements of the crimes with which it has been charged.

## <u>Charge to Which Defendant Is Pleading Guilty</u>

5.     By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count One, which charges defendant with honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

## <u>Factual Basis</u>

6.     Defendant will plead guilty because it is in fact guilty of the charge contained in Count One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish its guilt beyond a reasonable doubt:

SYNESI ASSOCIATES, LLC was an Illinois corporation that offered education-related services to the public education industry. Gary Solomon was the Chief Executive Officer, and Thomas Vranas was the president of The SUPES Academy, LLC and SYNESI ASSOCIATES, LLC (collectively, the "SUPES Entities"). The SUPES Academy, LLC offered professional development training for school administrators.  SYNESI ASSOCIATES, LLC offered education consulting services and school diagnostic review and turnaround programs.  Generally, Solomon was responsible for sales and marketing of the SUPES Entities, which included traveling to conferences and school districts, while Vranas was responsible for the day-to-day operations of the SUPES Entities.

The Chicago Public Schools (CPS), District Number 299, was an independent school district and unit of local government governed by the Board of Education of

2

the City of Chicago, also known as the CBOE. The CBOE established the policies, standards, goals and initiatives for CPS.

From approximately the summer of 2011 until approximately April 30, 2012, Barbara Byrd-Bennett was a paid consultant for the SUPES Entities. In this capacity, among other duties, Byrd-Bennett served as a master teacher for The SUPES Academy, LLC, including for its then existing client CPS. Byrd-Bennett also assisted developing school diagnostic review and turnaround materials, called the Synesi School Turnaround Toolkit, for SYNESI ASSOCIATES, LLC.

In or about December 2011, The SUPES Academy, LLC entered into a contract with Organization A to provide a leadership development program for CPS network chiefs, which program became known as the Chicago Executive Leadership Academy, or CELA. From approximately December 2011 until approximately July 2012, CELA was funded by a grant of approximately $380,000 from Organization A and approximately $25,000 from CPS. While a paid consultant for The SUPES Academy, LLC, Byrd-Bennett served as Master Teacher and coach for the CPS CELA developmental program.

From approximately May 1, 2012 until October 12, 2012, CPS employed Byrd-Bennett as a consultant. Starting on or about October 12, 2012, Byrd-Bennett became the Chief Executive Officer and General Superintendent of CPS. She was an agent of CPS during the entirety of her employment with CPS. SYNESI ASSOCIATES, LLC understood that Byrd-Bennett could not have an economic interest in any vendor

contracts with the CBOE once she became a consultant for CPS. SYNESI ASSOCIATES, LLC also understood that Byrd-Bennett could not receive any private or financial benefits for herself or her family in connection with any vendor contracts with CPS.

Beginning no later than in or about April 2012, and continuing until at least April 2015, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, SYNESI ASSOCIATES, LLC, together with Byrd-Bennett, Solomon, Vranas, and The SUPES Academy, LLC, knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from CPS by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and to defraud and deprive CPS and the Chicago Board of Education of their right to the honest services of Byrd-Bennett through bribery.

Specifically, Solomon and Vranas, both acting on behalf of the SUPES Entities and intending to benefit the SUPES Entities, offered to provide Byrd-Bennett a bribe in the form of a personal financial benefit from Solomon, Vranas, and the SUPES Entities, in exchange for acts in Byrd-Bennett's official CPS capacity that were designed to promote and bring about the awarding of an October 24, 2012, $2.09 million CPS contract to The SUPES Academy. To this end, Solomon, acting on behalf of the SUPES Entities and intending to benefit the SUPES Entities, represented to Byrd-Bennett that the SUPES Entities would fund financial accounts for the benefit

4

of two of Byrd-Bennett's relatives (Relative A and Relative B) with payments consisting of funds derived, in part, from the revenues of the October 24, 2012, $2.09 million CPS contract awarded to the The SUPES Academy, LLC, which payments would be paid as part of a signing bonus paid to Byrd-Bennett upon her return to employment with the SUPES Entities.

While Byrd-Bennett was employed with CPS, Solomon and Vranas, both acting on behalf of the SUPES Entities and intending to benefit the SUPES Entities, provided Byrd-Bennett with personal financial benefits, including meals, an airplane ticket, and tickets to sporting events, and agreed to provide Byrd-Bennett with lucrative compensation as a consultant to the SUPES Entities upon the completion of her employment with CPS.

Specifically, in approximately December 2011, while Byrd-Bennett was working as a consultant for the SUPES Entities, Solomon and Vranas, both acting on behalf of the SUPES Entities and intending to benefit the SUPES Entities, negotiated a Consulting Agreement with Byrd-Bennett. Pursuant to the terms of the Consulting Agreement, the SUPES Entities agreed to compensate Byrd-Bennett with a percentage of the gross revenues of any contract awarded to the SUPES Entities if, among other things, Byrd-Bennett provided sales services for the contract. Although the general terms of the Consulting Agreement were settled by late January or early February 2012, Byrd-Bennett did not sign the compensation agreement until in or about April 2012.

5

As of approximately March 2012, Solomon was involved in negotiating Byrd-Bennett's consulting contract with CPS and encouraged Byrd-Bennett to accept the consulting position with CPS. From his conversations with Byrd-Bennett, Solomon understood that Byrd-Bennett was reluctant to take the consulting position with CPS. Solomon, acting on behalf of the SUPES Entities and for the benefit of the SUPES Entities, encouraged Byrd-Bennett to take a position with CPS by explaining that it would be good for the SUPES Entities if Byrd-Bennett took the job, good for Byrd-Bennett, and good for CPS and the city. Solomon told Byrd-Bennett that once her consulting work with CPS was done, she could return to the SUPES Entities and work in Chicago again with leadership development and in other locations for the SUPES Entities. From conversations between Byrd-Bennett, Solomon, and Vranas, the SUPES Entities understood that Byrd-Bennett was only leaving the SUPES Entities temporarily to join CPS as a consultant and expected Byrd-Bennett to return to the SUPES Entities following the completion of her consulting contract with CPS.

When Byrd-Bennett became a consultant for CPS on or about May 1, 2012, the SUPES Entities owed her compensation for services that she performed on contracts that she helped obtain prior to her employment with CPS, and for her work as a master teacher related to CPS's CELA development program. Solomon, on behalf of the SUPES Entities and for the benefit of the SUPES Entities, expressed concern to Byrd-Bennett about paying her what the SUPES Entities owed her while Byrd-Bennett was at CPS. Solomon, on behalf of the SUPES Entities and for the benefit

6

of the SUPES Entities, was concerned about the appearance of a conflict of interest if Byrd-Bennett received payment from the SUPES Entities at the same time that CPS awarded contracts to the SUPES Entities. Solomon, on behalf of the SUPES Entities and for the benefit of the SUPES Entities, suggested to Byrd-Bennett that he place the money owed to her by the SUPES Entities into a trust when the SUPES Entities received payment on these contracts. Solomon, on behalf of the SUPES Entities and for the benefit of the SUPES Entities, expected to pay those funds to Byrd-Bennett once she returned to the SUPES Entities. Solomon, on behalf of the SUPES Entities and for the benefit of the SUPES Entities, and Byrd-Bennett agreed that Solomon and the SUPES Entities would create the trusts for Byrd-Bennett's relatives that Solomon and the SUPES Entities would fund with the money that was owed to her.

SYNESI ASSOCIATES, LLC acknowledges that throughout the summer and fall of 2012 and in her official CPS Capacity, Byrd-Bennett participated in a number of meetings with representatives of Organization A, where she presented her idea to further expand CELA to include school principals for the 2012-2013 school year. Byrd-Bennett repeatedly requested funding from Organization A to fund CELA for the 2012-2013 school year and its expansion to principals. At the urging of Solomon, on behalf of The SUPES Academy, LLC and for the benefit of The SUPES Academy, LLC, Byrd-Bennett asked Official A to request funding from Organization A for CELA and its expansion. Byrd-Bennett directed CPS employees to identify funding within

7

CPS to cover the costs of an expansion of CELA and to contract with The SUPES Academy, LLC through the CPS procurement process in 2012 and 2013.

On or about October 24, 2012, the CBOE approved a $2.09 million, sole-source contract for The SUPES Academy, LLC for leadership development services, including an expansion of CELA to principals. Based on conversations and communications between Solomon and Byrd-Bennett, SYNESI ASSOCIATES, LLC understood that Byrd-Bennett believed that under the terms of her Consulting Agreement, Solomon, Vranas, and the SUPES Entities would pay Byrd-Bennett 10% of the gross value of the October 24, 2012 contract. Solomon, on behalf of and for the benefit of the SUPES Entities, sent email correspondence to Byrd-Bennett to confirm Byrd-Bennett's understanding that she would receive 10% of the gross value of the October 24, 2012 contract.

Specifically, on December 2, 2012, Byrd-Bennett sent an email to Solomon, which contained the personal identifying information for Relative A and Relative B and stated, "With the totals you shared, I would like the accounts to be equal. I would like the flexibility to use funds for whatever reason as needed for them....I know we calculated PG and St. Louis....what is it for Chicago, assuming we hit the full amount? And finally, this would be the same for Synesi when I make it happen, yes? Let me know and let me know when...how soon you can get the accounts set up." In an email dated December 6, 2012, Solomon, on behalf of and for the benefit of the SUPES Entities, confirmed that he, Vranas, and the SUPES Entities had created

accounts that, upon withdrawal, they would pay taxes on and distribute the amounts in the accounts. Solomon stated "[i]t is our assumption, that the distribution will serve as a signing bonus upon your return to SUPES/Synesi. If you only join for the day, you will be the highest paid person on the planet for that day. Regardless, it will be paid out on day one." Solomon forwarded these emails to Vranas, stating, "You can call her any time you like." Vranas responded, "I haven't been part of those discussions at all. I can if you want let me know. Everyone sucks and is greedy." From the email correspondence between Byrd-Bennett and Solomon, SYNESI ASSOCIATES, LLC understood that Byrd-Bennett was asking about the money she was owed both for work she had done prior to joining CPS and also for her assistance in obtaining the $2.09 million contract that The SUPES Academy, LLC received from CPS.

In approximately the fall of 2012, Solomon and Vranas, on behalf of and for the benefit of the SUPES Entities, began to set aside compensation for Byrd-Bennett that she had earned for work she had performed for the SUPES Entities prior to becoming a consultant with CPS. Solomon and Vranas, on behalf of and for the benefit of the SUPES Entities, first considered setting up college fund-type accounts for the benefit of Relative A and Relative B. Vranas, on behalf of and for the benefit of the SUPES Entities, consulted with a financial advisor about setting up these accounts.

After learning that they could not set up the college fund-type accounts based on the advice of their financial advisor, Solomon and Vranas, on behalf of and for the

benefit of the SUPES Entities, then decided to open a bank account for the benefit of Byrd-Bennett and to deposit money into that account and to pay taxes on that money. Vranas opened the account but never funded it. Instead, Solomon and Vranas, on behalf of and for the benefit of the SUPES Entities, maintained a line item within The SUPES Academy, LLC's internal financial statements in which money for Byrd-Bennett, as well as The SUPES Academy, LLC's general future growth and development needs, was accrued. The line item within which The SUPES Academy, LLC accrued money for Byrd-Bennett and its general growth was called the "development fund." Solomon and Vranas, on behalf of and for the benefit of the SUPES Entities, accrued a portion of the payments The SUPES Academy, LLC received from school districts, including but not limited to CPS, in the development fund in anticipation of, among other business expenses, paying Byrd-Bennett both a signing bonus and a salary upon her return to the SUPES Entities.

On or about January 23, 2013, the CBOE approved (1) a $225,000 settlement payment to The SUPES Academy, LLC for work performed by The SUPES Academy, LLC prior to the October 24, 2012 sole-source contract being approved, and (2) a $225,000 contract extension of services for the October 24, 2012 contract. The SUPES Entities understood that Byrd-Bennett believed that the SUPES Academy, LLC would compensate her for her assistance in obtaining the settlement agreement and contract when she returned to the SUPES Entities. Solomon, on behalf of and for the benefit of the SUPES Entities, intentionally allowed Byrd-Bennett to believe that she

would receive compensation for her assistance in obtaining the settlement agreement and contract.

From approximately the fall of 2012 until the spring of 2014, Solomon, Vranas, and The SUPES Academy, LLC set aside funds, ranging from approximately 4% to 9% of payments The SUPES Academy, LLC received from CPS and other entities, in the "development fund," a portion of which the SUPES Entities anticipated would be paid to Byrd-Bennett upon her return to the SUPES Entities as a reward for her efforts to obtain the October 24, 2012, $2.09 million contract for The SUPES Academy, LLC with CPS.

Through his conversations and communications with Byrd-Bennett, for at least some period of time, Solomon, on behalf of and for the benefit of the SUPES Entities, led Byrd-Bennett to believe that Solomon, Vranas, and The SUPES Academy, LLC created and funded financial accounts for the benefit of Relative A and Relative B of Byrd-Bennett. Based on Solomon's conversations and communications with Byrd-Bennett, SYNESI ASSOCIATES, LLC understood that Byrd-Bennett believed that these accounts contained payments owed to Byrd-Bennett for her official actions at CPS leading to the award of the October 24, 2012 contract to The SUPES Academy, LLC, as well as contracts awarded by other school districts to the SUPES Entities while Byrd-Bennett was a consultant for the SUPES Entities.

Solomon, on behalf of and for the benefit of the SUPES Entities, later informed Byrd-Bennett that he, Vranas, and the SUPES Entities intended to hold the

payments for Byrd-Bennett's official actions leading to the October 24, 2012 contract until after her employment with CPS ended and to make these payments as part of a "signing bonus" upon her return to employment with the SUPES Entities. Solomon, on behalf of and for the benefit of the SUPES Entities, told Byrd-Bennett that the accounts for Relative A and Relative B contained approximately $127,000 each, which funds represented approximately 10% of the gross proceeds of the October 24, 2012 contract, in addition to funds the SUPES Entities owed to Byrd-Bennett for work performed in other school districts prior to her employment with CPS.

On or about June 26, 2013, the CBOE approved a $20.5 million sole-source contract to The SUPES Academy, LLC for leadership development services for CELA.

In the summer of 2013, SYNESI ASSOCIATES, LLC learned that the CBOE Inspector General was conducting an investigation regarding the SUPES Entities' contracts with CPS. As part of the investigation, the CBOE Inspector General requested Byrd-Bennett's employment contract and compensation information from the SUPES Entities. The CBOE Inspector General also requested email correspondence regarding Byrd-Bennett. Vranas, on behalf of the SUPES Entities, was responsible for responding to the email request on behalf of the SUPES Entities. Vranas informed Solomon that as Vranas began conducting an email search for relevant emails on behalf of the SUPES Entities, Vranas located emails between himself and Solomon in which they discussed Byrd-Bennett helping them.

12

On or about April 29, 2012, in the Northern District of Illinois, Eastern Division, and elsewhere, SYNESI ASSOCIATES, LLC, together with Byrd-Bennett, Solomon, and The SUPES Academy, LLC, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of a wire communication in interstate commerce, certain signs, signals and sounds, namely, an email from Solomon to Byrd-Bennett, stating, in part, "When this stint at CPS is done and you are ready to re re re retire, we have your spot waiting for you. Hopefully, with even more work and more opt. In the meantime, if we can figure a way to do deep principal PD at CPS, I can find a good home for [friends of BYRD-BENNETT's] and others, and make sure principles in CPS get kick ass training with kick ass teacher and kick ass coaching[,]" in violation of Title 18, United States Code, Section 1343 and 1346.

### Maximum Statutory Penalties

7.      Defendant understands that the charge to which it is pleading guilty carries the following statutory penalties:

> a.      A maximum sentence of 20 years' imprisonment. This offense carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater.

> b.      Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

13

c. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which it has pled guilty, in addition to any other penalty or restitution imposed.

## Sentencing Guidelines Calculations

8. Defendant understands that in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9. For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a. **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following

14

statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2015 Guidelines Manual.

      b.    **Fine Amount Calculations.**

      i.    Base fine. Pursuant to Guidelines §§ 8C2.3(a) and 8C2.4(b) and § 2C1.1(d)(1)(B), the base fine is the value of the benefit received in return for the payment. It is the government's position that the value of the benefit received was at least approximately $2 million. Defendant reserves the right to argue that the value of the benefit received was less than $1,500,000.

      ii.    Culpability Score. With regard to determining defendant's culpability score, pursuant to Guideline § 8C2.5(a), the base score is five points.

      1.    Pursuant to Guideline § 8C2.5(e), the culpability score is increased by three points because defendant willfully obstructed or impeded, attempted to obstruct or impede, or aided, abetted, or encouraged obstruction of justice during the investigation of the instant offense. Based on the guilty plea of Thomas Vranas, defendant agrees with the government's position.

      2.    It is the government's position that, pursuant to Guideline § 8C2.6, the applicable minimum and maximum multipliers for a culpability score of 8 are 1.60 and 3.20, respectively. Defendant reserves the right to dispute this calculation.

iii.     If the Court determines at the time of sentencing that defendant fully cooperated in the investigation and has clearly demonstrated a recognition and affirmative acceptance of responsibility for its criminal conduct within the meaning of Guideline § 8C2.5(g)(2), a two-level reduction in the offense level will be appropriate. The government reserves the right to take whatever position it deems appropriate at the time of sentencing with respect to whether defendant has accepted responsibility within the meaning of Guideline § 8C2.5(g)(2).

c.     **Anticipated Advisory Guideline Fine Range.**   Therefore, based on the facts now known to the government and pursuant to Guideline § 8C2.7, the anticipated advisory guideline fine range is $3,200,000 to $6,400,000.  Defendant reserves the right to argue that this advisory guideline fine range does not apply.

d.     Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw its plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

### Agreements Relating to Sentencing

10.     Each party is free to recommend whatever sentence it deems appropriate.

11.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw its guilty plea.

12.     Regarding restitution, defendant acknowledges that the total amount of restitution owed to the Chicago Public Schools is $256,000, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution in the amount outstanding at the time of sentencing.

13.     Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), it is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect its ability to pay restitution.

14.    Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

15.    Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

16.    After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment, as well as the forfeiture allegation as to defendant.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

17.    This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 15 CR 620.

18.    This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other

federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

19.     Defendant understands that by pleading guilty it surrenders certain rights, including the following:

      a.     **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against it, and if it does, it would have the right to a public and speedy trial.

      i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

      ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and its attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

      iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of its guilt beyond a

reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

        iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and its attorney would be able to cross-examine them.

        vi.     At a trial, defendant could present witnesses and other evidence in its own behalf. If the witnesses for defendant would not appear voluntarily, it could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

        b.    **Appellate rights.** Defendant further understands it is waiving all appellate issues that might have been available if it had exercised its right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

20.    Defendant understands that by pleading guilty it is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to it, and the consequences of its waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

21.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against it, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing.

22.    Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of its financial circumstances, including its recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of its sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

21

23.     For the purpose of monitoring defendant's compliance with its obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

24.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

25.     Defendant agrees that its obligations under this Plea Agreement survive any change in its corporate name, form, or status.

## Conclusion

26.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

27.     Defendant understands that its compliance with each part of this Agreement extends throughout the period of its sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event it violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

28.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

29.     Defendant and its attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

23

30.     Defendant acknowledges that it has read this Agreement and carefully
reviewed each provision with its attorney. Defendant further acknowledges that it
understands and voluntarily accepts each and every term and condition of this
Agreement.


AGREED THIS DATE: 10/18/16


Zachary J. Fardon
ZACHARY T. FARDON  by LJBarsella
United States Attorney

SYNESI ASSOCIATES, LLC
Defendant

Megan C. _____
MEGAN CUNNIFF CHURCH
LINDSAY JENKINS
Assistant U.S. Attorneys

SHELLY B. KULWIN
Attorney for Defendant


24